UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
                                    :         09 CR 219 (HB)
         - against -                :
                                    :         OPINION &
                                    :         ORDER
ALBERTO MENDOZA                     :
                                    :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Defendant Alberto Mendoza ("Mendoza") is charged in a one-count indictment with conspiracy to distribute and to possess with intent to distribute more than 100 grams of heroin. Alleging violations of the Fourth Amendment, Mendoza moves to suppress physical evidence that was the product of a law-enforcement entry into his home on the day of his arrest. I heard argument and held an evidentiary hearing on August 5, 2009. For the reasons that follow, Mendoza's motion is DENIED.

## FACTUAL BACKGROUND

      On November 10, 2008, Mendoza was arrested as he exited his home at 79-10 32nd Street in Queens through a side door. Tr. 71.[1] The investigation that led to his arrest began a short time prior to that date, when a confidential informant ("CI") informed Drug Enforcement Agency ("DEA") Special Agent Brian Crowe ("Crowe") that he, the CI, could purchase one kilogram of heroin from an individual who was later identified as Mendoza's co-defendant in the indictment, Carlos Gomez ("Gomez").[2] Tr. 6. Thereafter, Crowe instructed the CI to arrange to meet with Gomez to obtain a sample of the drug. Tr. 7. The CI met with Gomez on November 6, 2008 in the Bronx, and Gomez provided a sample that later tested positive as heroin.[3] Tr. 7, 83. Subsequently, the CI arranged for the one-kilogram transaction to occur on November 10. Tr. 8. It was agreed that Gomez would meet a livery cab, ostensibly driven by an employee of the CI who was in fact an undercover agent. Tr. 11. Through a series of phone calls, some of which were recorded and all of which were monitored by Crowe and his fellow agents, the CI and

---

[1] References to "Tr." refer to the transcript of the August 5, 2009 suppression hearing.

[2] Crowe testified that the CI was "somewhat new" but had provided reliable information on one or two previous occasions. Tr. 6-7.

[3] The investigating agents did not observe the CI meet with Gomez to obtain the sample of drugs. Tr. 9.

1

Gomez refined the details of the planned transaction. Tr. 9-11. It was clear to the agents that initially Gomez did not know where the transaction would occur, first telling the CI only that the meeting would be somewhere in Queens. Tr. 12. Ultimately, Gomez informed the CI that the meeting would occur on the corner of 32nd Avenue and 79th Street in Queens. Id. Gomez also informed the CI that the quantity of heroin would be 804 grams, instead of the kilogram that was originally contemplated. Tr. 11.

Crowe testified that he and the CI drove to the designated corner in the early evening of November 10, 2008, and from the car the CI identified Gomez for Crowe and his fellow agents.[4] Tr. 12. Shortly after the CI identified Gomez, Crowe parked his vehicle in a driveway in the middle of the block on 32nd Avenue, almost directly across the street from the home at 79-10 32nd Street, and together with other agents took up surveillance of the corner.[5] Tr. 12, 62. The agents observed the livery cab pull up to the corner and saw Gomez enter the vehicle, which then drove slowly down the block, at which point Gomez exited the vehicle. Tr. 13. Although Crowe did not hear the radio transmissions directly, other members of the task force, by means of a concealed recording device, were listening in on the conversation between Gomez and the undercover agent posing as a livery cab driver. Tr. 13-14.

After Gomez exited the livery cab, the agents surveilling from their vehicle observed him walk up the block toward the home at 79-10 32nd Avenue, at which point an individual whom they had never seen before, but was later determined to be Mendoza, exited the residence. Tr. 15. Mendoza handed Gomez a black backpack and return to the home; the agents could not hear what, if anything, was said in the exchange. Tr. 15, 20, 65. The livery cab then returned, but as Gomez attempted to enter the car it sped off and a signal was given to arrest Gomez. Tr. 17-18. Gomez was arrested on the sidewalk, approximately two doors down from the home at 79-10 32nd Avenue, causing some commotion on the block. Tr. 18, 36. The arresting agents quickly determined that the backpack that Mendoza had handed Gomez carried only a bicycle pump and contained no contraband. Tr. 18, 37.

Crowe, Special Agent Matthew Griemel (who also testified at the hearing), and three other agents then went up the stoop to the door to 79-10, knocked, and announced their presence

---

[4] In all there were approximately ten law enforcement agents assigned to the operation, who were part of a joint task force comprised of DEA agents, New York Police Department officers, and agents of Immigration and Customs Enforcement.

[5] This was the first time that the agents had ever established surveillance on the area and, prior to the night of November 10, they had no reason to suspect that the home had any connection to drugs. Tr. 39.

2

as police officers. Tr. 19, 22. Crowe testified that he approached the home because he believed it was a stash house for the heroin, based in part on the fact that the telephone calls between the CI and Gomez confirmed that Gomez had to travel to a location in order to obtain the drugs and consummate the transaction as planned. Tr. 19. After the agents knocked, through the glass panes of the front door they observed Mendoza descend the staircase and peer out through the glass at the agents in their protective vests marked "Police" and the "commotion" that surrounded the site of Gomez's arrest. Tr. 23. Mendoza then turned and ran quickly up the stairs, turning off the light as he went. Tr. 23.

At this point, Agent Griemel kicked in the door, and the agents followed Mendoza but lost him. Tr. 24. When they arrived at the top of the staircase they entered into an open eating area and noticed ahead and to the right a room with its door open and a light and television on inside. Tr. 25, 27, 29. Griemel and Crowe entered the room, which each of them testified was small and sparsely furnished with only a mattress on the floor and a small television on a nightstand. Tr. 29, 79. The agents scanned the room briefly looking for Mendoza and opened the door to the closet as part of their sweep. Tr. 48. Crowe testified that as he turned to exit, he looked down and observed a black duffle bag on the mattress in plain view such that "you wouldn't have been able to miss it." Tr. 52. The bag was open and in it Crowe observed taped packages with numbers written on them and that resembled others that he had seen in other narcotics investigations. Tr. 30. Greimel also testified that the open bag was visible from the doorway as he entered the room with Crowe to look for Mendoza and that he necessarily moved closer to it as he entered the room to help conduct the sweep. Tr. 70. Shortly thereafter, Crowe and Griemel were advised by their fellow agents that Mendoza had been arrested exiting the building by way of a side door. Tr. 71. Ultimately it was determined that the bag contained 804 grams of heroin in two taped packages, one numbered "661" and the other "103." Tr. 30.

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. AM. IV. A warrantless search is *per se* unreasonable unless one of a "'few specifically established and well-delineated exceptions" applies. Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). Because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," the Supreme Court has repeatedly held that warrantless searches and seizures inside a

3

home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 585-586 (1980) (internal quotation omitted). Consequently, the Government bears the burden of proving that entry to a defendant's home was justified. See United States v. Zabare, 871 F.2d 282, 289 (2d Cir. 1989) (citing Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971)).

**A. Exigent Circumstances**

It is well-established "that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990) (en banc), cert. denied, 498 U.S. 1119 (1991)). Thus, "'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002) (quoting Kirk v. Louisiana, 536 U.S. 635 (2002) (per curiam)). "Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." United States v. Gallo-Roman, 816 F.2d 76, 79 (2d Cir. 1987). Such situations have been found to include hot pursuit of a fleeing felon, United States v. Santana, 427 U.S. 38, 42-43 (1976), actions taken to prevent the destruction of evidence, Schmerber v. California, 384 U.S. 757, 770-71 (1966), and actions taken in response to an ongoing fire, Michigan v. Tyler, 436 U.S. 499, 509 (1978). "The essential question" in the determination is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." MacDonald, 916 F.2d at 769.

"[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." United States v. Gordils, 982 F.2d 64, 69 (2d Cir. 1992). The Second Circuit has articulated six factors or guideposts to guide the inquiry; they are as follows:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

MacDonald, 916 F.2d at 769-70 (internal quotation marks and alterations omitted). "These factors are 'intended not as an exhaustive canon, but as an illustrative sampling of the kinds of

facts to be taken into account,'" such that "the presence or absence of a single factor is not dispositive." Loria, 306 F.3d at 1284 (quoting MacDonald, 916 F.2d at 770).

1. Probable Cause

Although a "clear showing of probable cause" is articulated as one of the six "illustrative" factors of which it has been said that none are dispositive, the Supreme Court has stated that for a home-entry to be lawful it must be supported by either a warrant or " probable cause plus exigent circumstances" Kirk, 536 U.S. at 635 (emphasis added). In any event, the centrality of probable cause to the essential question before me warrants a full explication of the reasons for and the reasonableness of the agents' belief that they had probable cause to enter the home—whether to arrest Mendoza or to prevent the likely destruction of evidence.

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'" United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008). "Perhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a 'fair probability,' or a "substantial chance," of discovering evidence of criminal activity." Safford Unified School Dist. No. 1 v. Redding, 129 S.Ct. 2633, 2639 (2009) (quoting Illinois v. Gates, 462 U.S. 213, 238, 244, n. 13 (1983)). Because it "deals with probabilities and depends on the totality of the circumstances," however, the probable-cause standard is not susceptible to "precise definition." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (citing Gates, 462 U.S. at 232)).

Mendoza argues that the agents lacked probable cause to enter his home because prior to the night of November 10, 2008 there was nothing to link him to a narcotics conspiracy, and the only observation of him that preceded the agents' entry was his meeting with Gomez to hand off a backpack that contained no contraband. Mendoza's argument falls short. First, under the totality of the circumstances, the agents had probable cause to believe that Gomez and Mendoza were engaged, jointly, in a transaction to sell 804 grams of heroin to the undercover agent. Crowe testified that although the CI was "somewhat new," he had provided reliable information on one or two prior occasions. Tr. 6-7. When this CI met with and received from Gomez a sample that tested positive for heroin, the agents had a reasonable basis to believe that Gomez would in fact be able to deliver the larger quantity of the drug that was promised. Furthermore, the CI's conversations with Gomez on the day the transaction was to occur—some of which

5

were recorded and all of which were monitored—strongly suggested that Gomez was not acting alone: Gomez had changed both the meeting place and the specific quantity of the drug to be sold, suggesting to the agents that the drugs were not in Gomez's possession and that he was not calling the shots. Tr. 12, 19. The agents' suspicions that another person was involved were further supported when they observed Mendoza exit the home and hand Gomez the backpack. It is true that the scales may have tipped slightly against a reasonable belief that Mendoza was involved in a contemplated drug deal when the bag was found without drugs. Nevertheless, under the totality of the facts of the agents' undercover operation, the agents' direct observation of Mendoza's exchange with Gomez, in the middle of what they had every reason to believe was an ongoing narcotics transaction, corroborates the reasonableness of their belief that Mendoza was in fact involved in the criminal activity they had witnessed.

Second, once the backpack proved to be empty of drugs, the circumstances were such to raise a "fair probability" or a "substantial chance" that the drugs remained in the home from which Mendoza had emerged. Crowe testified that he believed the home was a "stash house." This belief was based in part on the fact that Gomez had changed the location of the meeting to the corner of 32nd Avenue and 79th Street, causing the agents to reasonably believe that the drugs must be somewhere nearby. After watching Mendoza emerge from the home at 79-10 32nd Avenue, the most obvious location was that residence.

Third and finally, the events which followed the agents' approach to the home and announcement of their presence—namely, Mendoza's descent of the stairway, observation of the agents and the "commotion" that accompanied Gomez's arrest, and his flight up the stairs—not only provide further corroboration for the agent's reasonable belief that Mendoza was involved in the commission of a crime but also supply "an ample basis for the apprehension that evidence in the home might be destroyed if it were not immediately secured." United States v. Schaper, 903 F.2d 891, 894 (2d Cir. 1990). When combined with probable cause to believe that narcotics are present behind it, the sound of "shuffling feet" and "hurried conversation" heard through a closed door has been held to justify immediate, warrantless entry to prevent the destruction of evidence. United States v. Manning, 448 F.2d 992, 999 (2d Cir. 1971) (en banc); Gordlis, 982 F.2d at 69-70. If hearing suspicious but unidentified noises suffices to establish a justifiable fear that evidence will be destroyed, direct observation of the defendant fleeing at the sight of law enforcement must also form an "ample basis" for such an apprehension. Schaper, 903 F.2d 894.

At the hearing, Mendoza's counsel attempted to distinguish cases such as United States v. Miles, 903 F.3d 382 (2d Cir. 1989) and United States v. Schraper because, according to counsel, in those cases the probable cause that the suspects were involved in narcotics transactions was far stronger.  In Schraper, the suspect called off a drug transaction with a confidential informant after detecting and evading surveillance, and was arrested after being observed leaving his home carrying a handled bag that to the arresting officers appeared to contain torn-up records of narcotics sales.  903 F.2d at 893.  In Miles, a confidential informant posing as a buyer notified agents that narcotics were present inside an apartment after he left, ostensibly to retrieve money for the purchase.  889 F.2d at 382.  But even if the observations that supported the probable cause of an actual drug transaction were incrementally stronger in those cases—a fact about which I have my doubts—the agents' observations here were sufficient to support probable cause that Mendoza was involved in the aborted drug transaction.

In sum, the agents' testimony amply supports that they had probable cause to believe that Mendoza was engaged in a narcotics transaction in collaboration with Gomez, that narcotics were present in the home, and that in the absence of immediate action there was a fair probability that evidence would be destroyed.

2. The Balance of the Second Circuit's Guideposts

Analysis of the balance of the Second Circuit's illustrative guideposts for determining whether exigent circumstances justify warrantless entry supports the lawfulness of the agent's entry into the home in pursuit of Mendoza.  First, the Second Circuit has found that suspected sale of large quantities of drugs is a "serious" offense – and the transaction alleged here was to be for nearly a kilogram of heroin.  See Gordlis, 982 F.2d at 69; MacDonald, 916 F.2d at 770.  Second, although the agents testified that they observed no weapons in the course of the operation that led to Mendoza's arrest, Tr. 34, Agent Crowe testified that in his experience it was typical for narcotics traffickers to keep weapons in a stash house.  Tr. 58.  Just as "narcotics agents are entitled to use their knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic," United States v. Manning, 448 F.3d 992, 998-99 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 995 (1971), so too is it proper to afford some weight to a reasonable fear, based on years of experience, that there might be weapons present in a home the agents had probable cause to believe was a stash house for narcotics.  Consequently, this second factor cuts somewhat in favor of exigent circumstances.

Under the fourth factor, the agents clearly had "strong reason to believe that the suspect [was] in the premises being entered," MacDonald, 916 F.2d at 769-70, because they not only observed Mendoza return to the home but also directly observed him through the glass of the front door.  With respect to the fifth guidepost factor, there was arguably some "likelihood that the suspect [would] escape if not swiftly apprehended," id., although the number of agents involved in the operation suggests that they could have relatively easily surrounded the home to prevent an escape, and they in fact did so.  Nevertheless, the agents who made the initial entry to the home "did not know whether there was a rear door" and "[t]he possibility of an unknown exit also had to be considered." Miles, 889 F.2d at 383.  Finally, although the agents' entry was anything but peaceful, the agents did attempt a peaceful entry by knocking and announcing their presence.  Though far from dispositive, this counts for something.  See MacDonald, 916 F.2d at 770 ("[T]he agents acted in accordance with the law, and first attempted to effect a peaceful entry by knocking and announcing themselves.")

In sum, under the totality of the circumstances, the hearing testimony establishes that the agents' warrantless entry into the home at 79-10 32nd Avenue in pursuit of Mendoza was justified by exigent circumstances and therefore did not contravene the Fourth Amendment.

**B. Plain View**

The lawfulness of the agents' entry into the home on the basis of exigent circumstances does not, alone, mean that the physical evidence recovered in the bedroom is admissible.  The Government contends, however, that the "plain view" doctrine immunizes from constitutional challenge the seizure of the narcotics and other evidence found on the mattress in the bedroom.  The plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  United States v. Gamble, 388 F.3d 74, 76 -77 (2d Cir. 2004) (internal quotation marks omitted).

As the Supreme Court stated in Texas v. Brown, 460 U.S. 730, 738-39, "'plain view' is perhaps better understood . . . not as an independent 'exception' to the warrant clause, but simply as an extension of whatever prior justification for an officer's 'access to an object' may be." From this statement, defense counsel argued that the Court must "look at the scope of what is permissible under the exigent circumstances doctrine and apply that scope to the plain view doctrine." Tr. at 86.  Thus, in defense counsel's view, because the exigent circumstances exception is designed to ensure that a home is "secured of people who may harm the officers or

8

destroy evidence," it cannot be used to "rummage" for evidence. Id. (emphasis added). Without taking issue with counsel's statement of the law, the argument elides the very essence of the "plain view" doctrine because it assumes that the incriminating evidence was not readily visible from any part of the room in which the agents were, at that time, lawfully present. Because I find that the open duffel bag of items that, to the experienced officers, immediately appeared to be evidence of narcotics trafficking were truly in "plain view," the argument falls short on these facts.

Both agents testified that the room was "small" (though no one was capable of estimating its dimensions) and sparsely furnished. Indeed, a television on a small stand and a mattress on the floor appear to have been the only furniture in the room. Although "inadvertent" discovery is not an express requirement for application of the "plain view" doctrine, Horton v. California, 496 U.S. 128, 141-142 (1990), on the basis of the agents' testimony—namely two men present and scanning a small room furnished with only with a television and a mattress—the discovery of the contents of the open bag at the foot of the mattress was very close to inevitable, and the contents of the open bag were, at a minimum, clearly visible from the place to which the officers had lawfully gained access. In Crowe's words, "you wouldn't have been able to miss it." Tr. 52. Consequently, the plain view doctrine ratifies the legality of the seizure of the bag and its contents, and Mendoza's motion to suppress the physical evidence that was the product of the agents' entry into the home must be DENIED.

## CONCLUSION

For the foregoing reasons Mendoza's motion to suppress on Fourth Amendment grounds the physical evidence that resulted from the agents' entry into his home on November 10, 2008 is DENIED.

**SO ORDERED**
**August 6 , 2009**
**New York, New York**

U.S.D.J.